## BERRY et al v. CHICAGO, M. & ST. P. RY. CO.

Under the direct provisions of Civ. Code, § 1583, a carrier cannot be exonerated by any agreement, made in anticipation thereof, for gross negligence.

Whether delays in the transportation of horses and broken timbers on the side of the car upon which the horses injured themselves were the result of gross negligence was for the jury, where different conclusions might have been drawn from the evidence.

A verdict is conclusive where different conclusions might have been drawn.

What horses would have sold for on the horse market, and what they did sell for, is a proper method of determining the difference in value between sound and injured animals, in an action against a carrier for delay in their transportation and for their negligent injury, as what property actually sells for on the open market is prima facie evidence of its real market value.

A witness who had been dealing in horses and shipping from 400 to 500 annually for 15 years, mostly to a certain market, was competent to testify on the market value of horses, as sound and as injured, at such market.

Where a live stock transportation contract required notice in writing of injury or loss, letters by the shipper to the claim agent itemizing the loss were the best evidence that notice was given and properly admitted.

A live stock carrier must furnish a car reasonably safe and suitable, in view of the kind, character, and nature of the stock to be transported.

A carrier cannot relieve itself of its failure to provide a suitable car by a stipulation in the bill of lading devolving upon the shipper the duty of selecting a suitable car.

A request to charge that, if injury to horses was as likely to have been caused by their natural propensity to kick and fight as by negligence of the carrier, the shipper was not entitled to recover was properly refused, where under the evidence the shipper might have recovered even if the jury found for the carrier on such proposition, as it was not restricted to damages resulting only from kicking and biting.

Where the value agreed upon for horses shipped was so out of harmony with their actual value as to indicate that the question of value did not in fact enter into the agreement, and the carrier, under the circumstances, must have known of the discrepancy, such value will be considered as a mere attempt by the carrier to secure partial exemption from liability, and of no effect in relieving it from the obligation of responding for the real value of the horses.

(Opinion filed, Jan. 26, 1910.)

Appeal from Circuit Court, Davison County. Hon. FRANK B. SMITH, Judge.

Action by A. C. Berry and another against the Chicago, Milwaukee & St. Paul Railway Company. From a judgment for plaintiffs, and an other denying a new trial, defendant appeals. Affirmed.

*Preston & Hannett* and *Charles E. Vroman,* for appellant. *A. E. Hitchock,* for respondents.

McCOY, J. The plaintiffs, who are purchasers and shippers of live stock, delivered to the defendant as a common carrier three car loads of horses to be transported by railroad to Chicago, Ill., and there delivered to J. S. Cooper, at the United States stockyards. Two car loads of said horses were delivered to defendant at Tripp, S. D., January 4, 1907, and the other car was delivered at Plankinton, S. D., on March 15th, the same year. The plaintiff claims that in the transportation and carriage of said horses the defendant so carelessly and negligently transported the same that by reason thereof said horses became bruised, maimed, and otherwise injured; that said negligence consisted in unnecessary and unreasonable delay, and unreasonable and un-

necessary unloading and reloading thereof; that from the time
the two car loads shipped from Tripp were reloaded at Mitchell,
S. D., at 2 o'clock p. m., January 5th, until 3 o'clock p. m., Jan-
uary 7th, when they arrived at Chicago, said horses were not un-
loaded from said cars in which they were loaded, and were not
given any water, feed, or other care; that at Mitchell, by direc-
tion of defendant, the said horses were unreasonably and un-
necessarily unloaded and reloaded, some of them on two dif-
ferent occasions, and during which the weather was inclement,
and the chutes icy and dangerous to use, and that by reason of
such unnecessary and unreasonable unloading and reloading over
such icy and dangerous chutes many of said horses became lame
and otherwise injured; that in the transportation of said horses
they were by direction of defendant put into unsound and unfit
cars, that the timber along the side of one car became broken,
and the ragged edges thereof caused injury and damage by
bruising and cutting the legs of many of said horses; that by
reason of the keeping of said horses in the said cars for such un-
reasonable length of time without food, water, or other care
caused them to become nervous, uneasy, and vicious, thereby
causing them to kick, bite, and otherwise injure themselves; that
when said horses were delivered to defendant they were sound,
and had been purchased for the purpose of sale, on the Chicago
market; that by reason of defendant's said negligence they be-
came bruised, maimed, and otherwise injured and damaged, all
to the damage of plaintiff in the sum of $687.50; and that within
30 days after the occurrence of such damage the plaintiff duly pre-
sented to defendant a claim in writing for the said damage to said
horses, and that said damage was not due to any act or default
or negligence on the part of plaintiff. Defendant denied the negli-
gence complained of, and alleged that said horses were shipped
by defendant under and by virtue of the terms of a written con-
tract, and not otherwise; that said contract contained the con-
dition that the defendant, for loss, injury, or damage for which
it may be responsible, shall be liable to the extent only of the
agreed valuation upon which the rate of compensation for such
transportation is based, and that by such contract the value of

only $100 each was placed on said horses; that said contract further provided that defendant should not be liable as an insurer of said horses transported under said contract; that the company, defendant, should not be liable for the acts of the animals to themselves or to each other, such as biting, kicking, etc., nor for the loss or damage arising from the condition of the animals, nor from their jumping from the cars, nor from loading or unloading; that the defendant should not be liable for the injury or damage of said stock by or on account of the delay thereof during its transportation, and it does not agree to deliver said stock at destination at any specific time; that the shipper, the plaintiff, had examined the cars in which said live stock was loaded, and has accepted the same as being in proper condition for the transportation thereof; that no claim for loss, injury, or damage to said live stock, nor for delay or decline in the market, nor for injury to the owner or person in charge thereof, shall be valid unless presented to the company in writing within 30 days after the same shall have occurred. The defendant alleged that if there was any delay or injury thereby in the transportation of said horses, the plaintiff was not entitled to recover therefor by reason of the terms of said contract; that plaintiff cannot recover for the injury caused by the biting or kicking of said horses, by reason of their vicious and unruly habits, by reason of the terms of said contract; that the plaintiff by the terms of said contract examined the cars in which said horses were shipped, and accepted the same as being in proper condition for the transportation thereof, and cannot recover for such injury on that account; that no claim in writing for damage to said horses, nor for delay, nor for decline in market, was presented to this defendant within 30 days after the alleged injury or damage occurred; and that by reason of said failure the plaintiff cannot recover. The case was tried to a jury, and a verdict for $525 rendered in favor of plaintiff, and judgment thereafter entered. Motion for new trial was made and overruled, and the defendant now brings the question to this court, assigning various errors.

The first eight assignments of error relate to the sufficiency of the evidence to sustain the verdict. It will serve no useful

purpose to therein recite all the evidence. We have reviewed the
entire testimony, and are of the opinion that the evidence was
sufficient to sustain the verdict. There is much conflict in the
evidence on many salient points, all of which have been resolved
in favor of the plaintiffs' by the verdict of the jury. Under the
statute of this state a common carrier cannot be exonerated by
any agreement or contract, made in anticipation thereof, for
gross negligence of himself or his servants. Civ. Code, § 1583.
The question of gross negligence under this statute was submitted
to the jury under proper instructions. The evidence tends to
show many delays on the part of defendant in the transportation
of said stock, and that these horses were kept confined in the
cars for something like 48 hours at one time without food or
water; and the evidence tends to show broken slats and timbers
on the side of a car, and that such slats and timbers were rotten
and decayed and covered over with paint, and all of which plain-
tiff claims injured many of said horses physically. Whether or
not such delays and breakages were the result of gross negli-
gence, under the circumstances of this case was a question for
the jury, as different conclusions might be drawn therefrom, and
the verdict of a jury, under such conditions, is conclusive.

It is insisted by defendant that the evidence fails to establish
the true and correct measure of damages, in that, it shows what
the horses sold for sound, and what they were resold for, and this
does not show how much less the animals would have sold for
on the Chicago market at the time when received there by reason
of their alleged damaged condition. Plaintiff A. C. Berry testi-
fied that he had been buying and selling horses for 20 years—
about 400 to 500 yearly—and had shipped mostly to Chicago, that
all these horses were sound when delivered to defendant, and
that when received at Chicago they were gaunt, drawn, bruised,
lame, and cut up. He testified what these horses, individually and
separately, would have sold for if sound, and what they did sell
for in their damaged condition; that after receiving them at Chi-
cago he took good care of them, employing veterinary surgeons
to treat and care for them, and that he was about two weeks in
disposing of them. We are of the opinion that what these horses

would have sold for on the horse market, and what they did sell for on the horse market at Chicago, at the time referred to in the question asked the witness, is proper method of determining the difference in value between uninjured and injured animals. What property actually sells for on the free and open market is prima facie evidence of its real market value, but is not conclusive. While the evidence in this case is not as direct as it might have been on this question, yet we are of the opinion that it is substantially sufficient. The witness, one of plaintiffs, who is presumed to know the value of his own property, was asked to state the difference in value between each horse claimed to have been damaged, in its damaged condition, and what it would have been worth had it not been damaged at the time it reached Chicago, and he answered that the mare (No. 37) would have sold for $225 sound, and she sold for $157 lame and bruised, and the witness continued so on down the list of horses claimed to have been damaged, in the same manner. Considering the former statements of the witness that he shipped these horses to Chicago for the purpose of sale on the market, and that these horses were delivered at the stockyards at Chicago, and were at such place at the time to which the testimony of this witness refers, the only logical inference from the answer of the witness, in the light of the question asked, is that this mare, had she not been injured, would have sold for $225 on the market in Chicago, at the time she reached the stockyards, and that she sold within two weeks thereafter for $157 in her lamed and bruised condition on the same market. We are of the opinion that this was one proper method of establishing the real market value of said horses as sound and as injured. The fact that this witness had been dealing in horses, and shipping from 400 to 500 annually for the last 15 years, mostly to the Chicago markets, rendered this witness competent of testifying on that subject. Johnson Commission Co. v. Wabash Ry. Co., 64 Mo. App. 595; 26 Cyc. 819; Harrison v. Glover, 72 N. Y. 451.

The defendant contends that the court erred in admitting in evidence, over defendant's objections, plaintiff's Exhibits B and C, being two letters written by plaintiffs to the claim agent of de-

fendant, specifying therein by items the amount of injury and loss to the horses in question, claimed by plaintiffs to have occurred by reason of negligent delays and breakage of cars. The plaintiffs contend that the sending of such letters to defendant, notifying it particularly of what plaintiffs claimed in relation to such loss, was required by the terms of such contract under which said horses were shipped, and that these letters constituted the best evidence as to notice of such claim to defendant. We are of the opinion that this ruling was correct. The provisions of the contract made evidence of this character permissible.

Defendant has 29 assignments of error relating to rulings of the trial court in sustaining and overruling objections to the introduction of evidence, and it would be impracticable to refer to each of these assignments separately. After careful consideration we are of the opinion that no prejudicial error exists therein.

The defendant contends that the court erred in instructing the jury of its own motion, relative to the broken car, that cars must be properly constructed and safe for shipment if they are to accommodate large and heavy horses. The instruction given by the court is as follows: "Now, gentlemen, in the transportation of live stock by a carrier, the cars that are furnished by the carrier for that purpose must be properly constructed, and safe and suitable for the transportation of the stock offered for shipment; reference being had to the kind and character and value of such stock. That is, when a carrier takes live stock to ship, it must take into consideration the kind and character of live stock, and furnish a car that is safe and suitable for the transportation of that particular kind of stock. If it is large, heavy, strong horses, the car must be proportionately safe and strong. In other words, it would require a stronger and better car to transport large, heavy, strong horses than it would to transport, for instance, a load of sheep or hogs or calves. Every carrier must take notice of the fact that large, heavy, young, strong horses, or horses that are unbroken, require a stronger vehicle, a much more safe and sound vehicle in construction than it would some smaller or less powerful animal. They must furnish a car which is suitable and safe for the transportation of that particular kind

of stock. They must take notice of the fact that horses and cattle are liable to exert a force upon the car, tax its strength in proportion to the size and strength of the animal, its disposition, its character, and whether it is broken, or whether it is unbroken and wild and vicious in disposition. Now the carrier is not bound to furnish the safest and most approved cars that can be found. It is enough that they are reasonably safe and suitable for the purposes for which they are furnished. The fact that the cars used are those which the carrier always uses is no defense, if in fact they are not suitable. So the question is up to the jury: Was the car furnished a car which was reasonably safe and suitable for the transportation of this stock, taking into consideration the kind and character and the nature of the stock to be transported?" We are of the opinion that this instruction correctly stated the law. Hutchinson on Carriers, § 509, and sections 495 to 508, inclusive.

Defendant also contends that the instruction was not appliable to the evidence in this case, for the reason that the contract under which the horses were shipped provided that plaintiff had seen and accepted the cars in which said horses were shipped. The plaintiff testified that the timbers and slats of the broken car were rotten and decayed, and that such rotten and decayed condition of the car was covered over with paint, so that the unsound condition could not be determined by inspection. But we are of the opinion that this position is not tenable. Section 508, Hutchinson on Carriers, reads as follows: "As we have seen, the duty of furnishing suitable vehicles rests upon the carrier, and not upon the shipper, and the failure to discharge this duty is negligence from the consequences of which the carrier is not permitted to free himself by a stipulation in the bill of lading which devolves upon the shipper the duty of selecting vehicles which are suitable. Such a stipulation is void, as an attempt by the carrier to limit his liability against his own negligence in providing defective vehicles. But if the shipper freely and voluntarily chooses not to rely upon this absolute duty to furnish suitable vehicles, and takes upon himself for a sufficient consideration, in the form of a reduced rate or otherwise, the duty of selecting vehicles which are suitable for the goods he intends to have

carried, he cannot hold the carriers liable for injuries arising from such patent defects as he ought to have discovered in his examination of the vehicles. But as to those defects which are not such that an ordinary inspection by the shipper would bring them to his attention, and yet are such that a reasonably careful inspection by a person experienced in such business would lead to their detection, an inspection and acceptance of the vehicle by the shipper will not save the carrier harmless from damages due to such defects, unless it can be shown that they were actually pointed out to the shipper, and that he accepted the vehicle with full knowledge of their existence. The burden of proof in a case of actual selection by the shipper is on the shipper to prove that a defect was not patent when he examined the vehicle." Betts v. C., R. I. & P. Ry., 92 Iowa, 343, 60 N. W. 623, 26 L. R. A. 248.

The defendant requested the following instruction which the court refused: "If you shall believe from all the evidence in this case that the injury to the horses in the Tripp shipment was as likely to have been caused by the natural propensity of the animals to kick and to fight, if any such has been shown, as by the negligence of defendant, if any, then the plaintiffs are not entitled to recovery." Defendant assigns the ruling of the court refusing this instruction as error. We are of the opinion that this instruction was properly refused, as it is not applicable to the evidence in the form in which requested. The last clause of this instruction reads: "Then the plaintiffs are not entitled to recovery." Under the evidence in this case the plaintiffs might be entitled to recovery even if the jury had found in favor of defendant on the proposition presented by this instruction. The refused instruction was not properly qualified so as to restrict its operative effect to damages resulting only from kicking and biting of the horses composing the Tripp shipment. The other requested instructions of defendant were also properly refused.

It is also contended by appellant that under the terms of the special contract of shipment plaintiffs could only recover that proportion of the value of the animals as declared in the special contract which said value bears to the actual value of the animals injured; the value of said horses being, by the terms

of said contract, limited to $100 each. That if the defendant was liable under the evidence on account of its negligence, then it is only liable for that proportion of the damage sustained which it bears to the declared value of the horses as compared with the actual value. We are of the opinion that this position of appellant is not tenable. It seems to be the rule that if the sum fixed by the shipping contract is fixed without any reference to the real value of the goods, the limitation will be considered as an attempt by the carrier to secure a partial exemption from liablity, and, in so far as its validity is concerned, it will stand on the same footing as any other condition intended to secure immunity from the consequences of negligence, and if a loss occurs which is attributable to the carrier's negligence, a condition by which it is attempted to fix the amount recoverable at a certain sum, irrespective of the real value of the goods, cannot avail the carrier, and the owner may recover to the full extent of his actual loss. Hutchinson on Carriers, § 425. It also seems to be the rule in some jurisdictions that the carrier, in order that he may exercise a degree of care and attention commensurate with the risk assumed, is entitled to be informed of the value of the goods intrusted to him for transportation, and a contract as to the value of the goods to be shipped, when fairly entered into with a view of placing a bona fide value on the goods, will be conclusive on the owner, and the carrier will not be liable for a greater sum than that at which the goods are valued, although his own misconduct has caused their loss, and that damages sustained under such a contract would be proportioned relatively to the value fixed by the contract as compared with the actual value. Hutchinson on Carriers, § 426. "But, while the owner of goods and the carrier may fix a value on the goods beyond which the carrier, in the event of loss, will not be liable, the agreement fixing the value, in order to be conclusive on the owner, must be bona fide and the value reasonable. If, for instance, the value agreed should be so far below the real value of the goods that from their appearance the carrier must have known the discrepancy, the agreement fixing the value would not be bona fide, and, depending on no value at all, would amount to an arbitrary limitation

upon the carrier's legal liability which, in the event of loss accasioned by negligence, would not deprive the owner of the right to recover the real value of the goods. While it is true that the owner of goods of great value which are concealed in packages, or otherwise hidden from view, upon which a very inconsiderable value has been placed by him, will be precluded, in case of loss, from the right to recover a greater sum than the value which he has placed upon them, the reason for this exception is that to charge the carrier with their real value when by the owner's misrepresentation he has been induced to undertake the employment at a reduced compensation, and to lessen the degree of care and vigilance which he otherwise would have exercised, would be to sanction fraud, and to enable the owner to gain an unfair advantage over the carrier through his own misrepresentation. The knowledge which the carrier has for the real value of the goods tendered to him for shimpent would therefore seem to be material in determining the effect of the valuation agreement upon his liability, although a contrary conclusion has been reached by some courts. And it may be stated as the better rule that, where the value agreed upon is so out of harmony with the ordinary values of similar kinds of goods as to indicate that the question of value did not in fact enter into the agreement, and the carrier, under the circumstances, must have known of the discrepancy, the agreement placing a value upon the goods will be considered as a mere attempt by the carrier to secure a partial exemption from liablity, and of no effect in relieving him from the obligation of responding for their real value where his misconduct has occasioned their loss. So, in the absence of fraud or concealment on the part of the owner of the goods whereby the carrier has been misled, the valuation agreed upon, it is said, must be reasonable, regard being had to the real value of the goods; and, if such value be unreasonable, the owner will not be estopped from claiming damages on the basis of their real value." The foregoing quotation from section 427, Hutchinson on Carriers, meets with our approval. When we take into consideration that the undisputed evidence shows that the horses in question were young farm animals weighing about 1,400 lbs.

each, and averaging in value something over $250 each, it is very easily discernible that the parties never attempted to fix a bona fide value thereon. The difference between the real value and the value as fixed by the contract is too great; is too unreasonable. The appellant''s agents authorized to receive these horses for transportation had ample opportunity to know the real or approximate value thereof, and could not by any means have been misled in relation thereto. It does not appear from the evidence that as a matter of fact the value of these horses, or horses of this class, had anything to do with fixing the freight rate thereon. The only reference thereto is in the recitals of the contract, and which would as readily lead one to infer that the freight rate was based on weight rather than value; that all common horses of the class shipped under this contract go at the same rate regardless of value. Therefore we are constrained to view that the limitation of value of $100 each, mentioned in the terms of said contract, was placed therein without any reference to the real value of the particular horses shipped under this contract, and that under the circumstances of this case such limitation should be considered as an attempt by respondent to secure partial exemption from liability, and stands on the same footing as any other condition intended to secure immunity from the consequences of negligence.

Finding no error in the record, the judgment and order denying a new trial are affirmed.